J-A12023-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: S.R.G.D., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.Y.T., MOTHER | : : : : : : : : | No. 2827 EDA 2024 |

Appeal from the Decree Entered September 6, 2024
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2024-A0069

BEFORE:  STABILE, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY DUBOW, J.:                   **FILED JUNE 27, 2025**

Appellant, S.Y.T. ("Mother"), appeals from the September 6, 2024 order that terminated her parental rights to three-year-old S.R.G.D. ("Child").[1] Upon review, we affirm.

The following factual and procedural history is relevant to this appeal. Child was born in March 2022.  On April 14, 2022, the Montgomery County Office of Children and Youth (the "Agency") took emergency custody of Child after receiving a report that Child was diagnosed with failure to thrive and that Mother was threatening to remove Child from the Children's Hospital of Philadelphia ("CHOP") against medical advice. On April 25, 2022, CHOP discharged Child and the Agency placed Child in foster care.  On May 25, 2022, the court adjudicated Child dependent.  The Agency set Family Service Plan

_____

[1] Child's biological father ("Father") signed a consent to adoption, which the trial court confirmed.  Father is not a party to this appeal.

("FSP") goals for Mother, including:  maintain recovery from substance abuse, participate in parenting classes, stabilize mental health, obtain and maintain stable housing and income, and consistently visit with Child.

Mother is diagnosed with post-traumatic stress disorder, complex post-traumatic stress disorder, anxiety, depression, adjustment disorder, attention deficit hyperactivity disorder, and bipolar disorder unspecified and receives mental health treatment through Creative Health.  She is unemployed and has lived in ten different places since Child was born.  Mother has lived in three garages, a car, a tent, an apartment though a housing program, and three other homes with roommates.  Mother has consistently refused to allow the Agency to inspect her housing and has consistently refused to give the Agency the names of her roommates so the caseworkers can conduct background checks.

Mother is currently living with a man that she met in a park and moved in with; he is a convicted sex offender.  Mother is engaged to E.J., who was incarcerated on drug charges at the time of the hearing.  Mother has plans to move to Oklahoma with E.J. to live on her brother's property.

Child is diagnosed with reflux, microcephaly with trigonocephaly, ptosis of her left eye, three small holes in her heart, metatarsus adductus, tibial torsion, autism, and TRIO neurodevelopmental disorder and receives various

services.[2]   Mother was simultaneously diagnosed with TRIO neurodevelopmental disorder.  In April of 2023, Child received a court-ordered nasogastric ("NG") tube to assist with feeding and weight gain.  In January of 2024, Child received a court-ordered a gastrostomy ("G") tube in place of the NG tube.  Mother was opposed to the recommended NG and G tube treatments and refused to learn how to care for Child with the NG and G tube.  Mother has attended approximately 10 out of 86 medical appointments for Child, despite the Agency and Child's foster mother making Mother aware of all appointments.

The Agency offered Mother numerous services including Justice Works Nurturing Parent, Abraxas visitation coaching, Lincoln Center case management, and Time Limited Family Reunification.  The Agency offered transportation and/or bus passes to assist Mother with visits.  Abraxas, Lincoln, and Time Limited closed out unsuccessfully after more than a year of service to Mother.

On October 13, 2023, the court changed Child's permanency goal to Adoption.  On January 9, 2024, the court granted the Agency's motion to suspend or reduce Mother's visitation.  On May 7, 2024, the Agency filed a petition to terminate.  The court appointed Kyle Felty, Esq., to serve as both

---

[2] TRIO neurodevelopmental disorder is "a variation in the TRIO, T-R-I-O, gene which causes a variety of different manifestations but part of it is feeding difficulties and poor weight gain."  N.T. Hearing, 7/23/24, at 133.

Child's legal counsel and guardian *ad litem* after finding that there was no conflict with counsel serving in the dual role.

On July 23, 2024, and September 5, 2024, the trial court held hearings on the termination petition. The court heard testimony from Danbrielle Shoener, Agency intake caseworker; Letha Kaminski, Agency ongoing caseworker; Codie Colon ("Foster Mother"), Child's foster mother; Diane Barsky, M.D.; associate professor of clinical pediatrics at the Perelman School of Medicine of the University of Pennsylvania and attending physician in the Division of Pediatric Gastroenterology, Hepatology, and Nutrition at CHOP; and Mother.

Ms. Shoener and Ms. Kaminski testified in accordance with the above-stated facts. Additionally, Ms. Kaminski testified that Mother currently has supervised visitation for two hours once per week with Child and that visitation has decreased, rather than increased, throughout the life of the case. Ms. Kaminski explained that Mother is consistently combative with Agency social workers and Child's doctors. She testified that Mother does not consistently attend Child's medical appointments, despite being invited. Ms. Kaminski testified that she arranged for Child to receive physical therapy during visitation so Mother could meet therapists and understand Child's needs, but Mother complained that the therapy left her little time to visit with Child and she refused to participate in therapy outside of visitation. Ms. Kaminski testified that she believed Mother would not be able to address and care for Child's extensive medical needs in the future. Ms. Kaminski further testified

that she would be concerned for Child's well-being and safety if Child were reunified with Mother because Mother has not demonstrated an ability to provide Child's necessary medical care or expressed an intention to continue to provide Child's necessary medical interventions and therapies.

Ms. Kaminski testified that Child has been placed in the same pre-adoptive foster home since being released from the hospital as a newborn. She explained that Child is bonded to the foster parents and looks to them for comfort, loves them, and is attached to them. Ms. Kaminski testified that the foster parents meet all of Child's medical, emotional, and day-to-day needs. In turn, Ms. Kaminsky testified that Child recognizes Mother as a familiar person but is not affectionate with Mother. Ms. Kaminsky testified that, in her opinion, Child would not be irreparably harmed if the trial court terminated Mother's parental rights because Mother has not shown stability, and Child is "doing well and attached and bonded with the foster parents." *Id.* at 173-74.

Foster Mother testified that she lives with her husband, their three children, and Child. Foster Mother testified that Child is treated by eight medical specialists as well as a pediatrician. Foster Mother informed the court that Child averages three to four appointments per week and that Child attends therapy twice a week, occupational therapy bi-weekly, special instruction bi-weekly, consults with a dietician, and was soon to start therapy for autism. Foster Mother reduced her work as a nurse from full-time to part-time to accommodate all of Child's necessary appointments. Finally, Foster Mother testified that Child is bonded to the whole foster family, Child loves

them, they all love Child, and they are all "super attached" to Child. N.T. Hearing, 7/23/24, at 67. Foster Mother testified that Child runs to them for comfort and always wants someone in the foster family around her. Foster Mother testified that she and her husband wish to adopt Child.

Dr. Barsky testified as an expert in pediatric nutrition and managing, diagnosing, and treating children with malnutrition. Dr. Barsky testified that, in addition to being a specialist in pediatric nutrition at CHOP, she started the pediatric feeding and swallow disorder program at CHOP, and is Child's treating physician. Dr. Barsky testified that in January 2024, she recommended that Child receive a G tube in place of the NG tube. She explained that Child required three feeds a day through the NG tube but had become an active toddler and was often getting tangled in the NG tube or pulling it out of her nose. Dr. Barsky testified, "[w]e usually do recommend consideration of the G tube after six months of being on the [NG] tube, because once it seems to be more of a long-term need, it is easier to use the G tube and there's less risks with the tube coming out or the child getting wrapped up in the NG tube and also concerns for aspiration." N.T. Hearing, 7/23/24, at 135. Dr. Barsky further testified that Mother does not understand Child's diagnoses or the need for a G tube and remained opposed to the procedure because it would produce a scar. Dr. Barsky explained that Child's overall health would be at serious risk without the G tube because, at the time, Child was not "taking in sufficient amounts orally through her nutrition supplement or oral intake to support her daily needs for calories, energy, and

brain development, and growth[,]" which was exasperated by Child's TRIO genetic variant. *Id.* at 136. Dr. Barsky informed the court that the Child received a G tube after the trial court issued an order authorizing it, but Mother did not consent to or attend the procedure.

Mother testified that she has been living with a man named J.S.S. for the past three weeks whom she met at a park with her three dogs while she was homeless. When counsel showed Mother a copy of his certified criminal conviction for sexually abusing his 12-year-old daughter, Mother replied that she was not aware that J.S.S. was a convicted sex offender. She testified that she currently receives food stamps and is seeking SSI benefits, she receives mental health treatment through Creative Health, she worked with Creative Health's career center to assist her with obtaining employment, and she continues to receive individual therapy. Mother admitted that she has not had steady employment in approximately ten years.

Mother testified that she was opposed to the G tube and NG tube because her first born child went through the procedures, and they did not help with that child's weight gain.[3] Mother also testified that she was opposed to Dr. Barsky's recommendation for a G tube because Dr. Barsky was a pediatrician, and Mother wanted the opinion of a "GI specialist" but no one at CHOP followed up on her request. N.T. Hearing, 9/5/24, at 53.

_____

[3] The child that Mother is referring to has lived in Tennessee with her maternal grandmother since 2021. Mother has not seen the child since 2022.

- 7 -

Mother testified that she was present for four of Child's medical appointments. She stated that she wanted to be at more of Child's medical appointments and explained, "[i]t wasn't the fact that I didn't want to be there, it was the fact that I didn't have a ride or it was too early for me to wake up for the phone call, but I did tell them if they wanted to call me they could at any given point and I never received a phone call[.]" *Id.* at 52. Mother testified that she does not have ongoing contact with Child's eight medical specialists and a primary care provider because no one provided her with the information.

Mother informed the court that she plans to move to Oklahoma to live in a mobile home on her brother's property and plans to secure Child ongoing medical treatment at Oklahoma City's Children's Hospital. Mother testified that her paramour E.J. will be released from incarceration in a few days and plans to move to Oklahoma with her. Mother acknowledged that her brother applied to be a placement resource for Child through the Interstate Compact on the Placement of Children ("ICPC") and was denied. Mother testified that she wants to continue to be in Child's life.

At the conclusion of the hearing, the trial court terminated Mother's parental rights to Child pursuant to Section 2511(a)(1), (2), (8) and (b).

Mother timely appealed. Both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues for our review:

1. Whether the honorable trial court erred as a matter of law and abused its discretion by terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), and (a)(8), particularly where it did not consider competent evidence and mischaracterized the record, and where insufficient evidence was presented of: abandonment in the last six months preceding the filing of the petition; repeated and continued incapacity or refusal to perform parental duties and an inability to remedy any conditions complained of; the continued existence of the conditions which led to placement; a lack of cooperation with the Agency; and the needs and welfare of Child?

2. Whether the honorable trial court erred in terminating Mother's parental rights based on environmental factors not within her ability to control such as housing and financial ability, particularly where the evidence showed that the Agency failed to make efforts to assist Mother in rectifying these conditions?

3. Whether the honorable trial court erred as a matter of law when it inappropriately shifted the burden of proof to Mother in evaluating the needs and welfare of the Child pursuant to 23 Pa.C.S. § 2511(b) and § 2511(a)(8) and erroneously required Mother to prove the existence and strength of her parental bond?

Mother's Br. at 4-5 (reordered for ease of disposition; some capitalization omitted).

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an

error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

Here, we concentrate our analysis on Section 2511(a)(1). Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses

- 11 -

on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. **K.Z.S.**, 946 A.2d at 758. "Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition [and] the most critical period for evaluation is the six months immediately preceding the filing of the termination petition." **L.A.K.**, 265 A.3d at 592.

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

**Id.** (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances." **Id.** (citations and internal quotation marks and alterations omitted). "To that end, even where the evidence clearly

- 12 -

establishes [that] a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citations and internal quotation marks and alterations omitted).

Mother argues that the trial court failed to focus on the six-month period immediately preceding the filing of the termination petition, placed too much weight on Mother's failure to participate in Child's daily feeding routine, and erred when it faulted Mother for failing to achieve her FSP goals related to financial stability and housing. Mother's Br. at 43, 44, 46. Mother avers that she failed to attend all of the medical appointments because she did not receive notice of every appointment. *Id.* at 50. Finally, Mother argues that because she maintained consistent contact with Child and continued to show an interest in Child throughout the life of the case, the trial court erred in terminating her parental rights pursuant to Section 2511(a)(1). *Id.* at 47. Mother's arguments lack merit.

Upon review, the trial court placed weight on the fact that Child required special medical care to meet her basic physical needs, and Mother failed to attend medical appointments and obtain training on how to care for Child's special medical needs. The trial court found:

Mother did not participate in the medical appointment where the NG tube was discussed. The NG tube was placed in April of 2023, after a court-order was signed, and [Mother] was not present during the procedure and did not visit [Child] in the hospital during the three days she was admitted. Mother was never trained on how to use the NG tube. The G tube was place[d] in March of 2024, and [M]other was never trained on how to use the G tube. Mother was not present for the procedure to place the G tube and never visited [Child] in the hospital.

Trial Ct. Op., 11/6/24, at 7 (unpaginated). The court considered Mother's individual circumstances and Mother's explanation about why she did not attend Child's numerous medical appointments but found Mother's reasons to be unavailing. The court opined:

Instead of accepting responsibility for participating in treatment, [M]other shifted the blame to [F]oster [M]other for not contacting her at the time of the appointment. [M]other never put dates on the calendar so she could keep track of all of the appointments. She also testified that some of the appointments were too early and was too tired to get up. Parenting is not a part-time job and not done at the convenience of the parent.

Trial Ct. Op. at 8-9 (unpaginated). Moreover, the trial court emphasized that Mother failed to take affirmative steps to perform parental duties and maintain a place of importance in Child's life. The court found that "[Mother] has never contacted [F]oster [M]other to find out how [Child] is doing. [Child] sees eight medical specialists in addition to her pediatrician, as well as four therapists. [Mother] has never participated in [Child]'s daily feeding routine. [Mother] has not sent cards or gifts to [Child] since she was placed in custody over two years ago." *Id.* at 9 (unpaginated). The trial court also found that Mother

- 14 -

failed to obtain employment, maintain financial responsibility, and obtain appropriate housing.  *Id.* (unpaginated).

Finally, the court emphasized that a parent must "demonstrate a willingness and capacity to undertake the parental role."  *Id.* at 11 (unpaginated).  Upon consideration, the court did not find Mother's explanations regarding her conduct to be credible and placed great weight on Mother's refusal to participate in Child's necessary medical and therapeutic care as well as the fact that Mother has not progressed to unsupervised visits.  The court opined:

> [M]other provided no credible testimony to explain her conduct since [Child] was moved from her care in 2022.  Eve[n] if she disagreed with the recommended treatment for the failure to thrive diagnosis, it does not justify her apparent lack of care for her daughter's medical needs.  She had attended virtually no medical appointments and does not participate with the team of medical doctors and therapists that care for her daughter on a regular basis. . . Mother has never had [C]hild alone in her care since she was removed in 2022.  Again, in fact, her supervised visits were decreased in January of 2024.

*Id.* at 11-13 (unpaginated).

Our review of the record supports the trial court's findings.  Mother asks us to consider the evidence in the light most favorable to her and conclude that she maintained an "interest" in Child throughout the life of the case.  *See* Mother's Br. at 47.  However, the Agency presented clear and convincing evidence that Mother refused to perform parental duties for Child, including providing necessary medical and therapeutic care, refused to attend medical appointments, refused to learn how to feed Child through the NG tube and G

tube, lacks employment and stable housing, and has failed to progress to unsupervised visitation. Furthermore, the court did not credit Mother's testimony that she did not receive notifications from the Agency or Foster Mother regarding the medical and therapeutic appointments. We decline to reweigh the evidence or usurp the trial court's credibility determinations. Accordingly, we discern no abuse of discretion in the trial court's finding that Mother refused to perform parental duties in the six months preceding the filing of the petition and its decision to terminate Mother's parental rights pursuant to Section 2511(a)(1).

With respect to Section 2511(b), our analysis focuses on whether there is a parental bond and how terminating that bond will affect the child. We review "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897

(Pa. Super. 2014). Rather, the court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).[4] Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Mother avers that the trial court abused its discretion when it terminated her parental rights pursuant to Section 2511(b). Mother's Br. at 4-5. She argues that the trial court erroneously placed the burden of proof on Mother, rather than the Agency, when it was analyzing Child's needs and welfare pursuant to Section 2511(b). *Id.* at 38. Mother further argues that the court erroneously "put weight on Mother's failure to proactively testify to her love and bond with Child[.]" *Id.* at 39. Mother mischaracterizes the trial court's findings.

Upon review, the trial court did not abuse its discretion when it found that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(b). The record reveals that the Agency presented ample evidence to support the trial court's findings.

---

[4] A foster family may be a resource family. *See* 23 Pa.C.S. § 6303 (A resource family is defined as a "family which provides temporary foster or kinship care for children who need out-of-home placement and may eventually provide permanency for those children, including an adoptive family.").

Specifically, the Agency presented testimony from Ms. Kaminski that Child did not have a parent-child bond with Mother and that Child would not experience irreparable emotional harm if Mother's parental rights were terminated. Ms. Kaminski further testified that Child loves and is attached to Foster Mother and the foster family, who take care of all of her emotional, physical, and medical needs. The Agency also presented testimony from Foster Mother, who expressed her love for Child and her wish to adopt Child.

In turn, the court observed that "Mother was unable to provide the Court with evidence to suggest that any bond exists between them . . . and not once during her testimony did she mention her love or any bond with her daughter." Trial Ct. Op. at 16-17. The court also emphasized that the Agency presented evidence that Child had not lived with Mother since she was six weeks old, that Mother has not progressed past supervised visitation, "nor has she provided for [Child] financially or emotionally." Trial Ct. Op. at 16-17 (unpaginated).

The record supports the trial court's findings. As always, we decline to reweigh the evidence or usurp the trial court's credibility determinations. Accordingly, we discern no abuse of discretion.

In conclusion, the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Sections 2511(a)(1) and (b). In light of our disposition, we decline to address Mother's remaining arguments.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>6/27/2025</u>